UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION


| | | |
|---|---|---|
| United States of America, | ) | April 11, 2019 |
| | ) | |
| Plaintiff, | ) | Greenville, SC |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Brandon Cory Lecroy, | ) | Case no(s).:8:18cr00480-BHH-1 |
| | ) | |
| Defendant. | ) | |


TRANSCRIPT OF SENTENCING

BEFORE THE HONORABLE BRUCE HOWE HENDRICKS
United States District Judge, presiding


A P P E A R A N C E S:

For Plaintiff:        WILLIAM J. WATKINS, Jr., Esquire
                      U.S. Attorney's Office
                      55 Beattie Place, Suite 700
                      Greenville, SC 29601


For Defendant:        ERICA M. SODERDAHL, Esquire
                      Federal Public Defender's Office
                      75 Beattie Place, Suite 950
                      Greenville, SC 29601



Teresa B. Johnson, CVR-M-CM, RVR, RVR-M
U.S. District Court Reporter
300 E. Washington Street, Room 304
Greenville, S.C. 29601


Proceedings recorded by stenomask, transcript produced by
computer-aided transcription.

Sentencing Hearing                                                                    2

1                        **P R O C E E D I N G S**

2          (Interpreter is first duly sworn.)

3          (Proceeding begins at 10:00 a.m.)

4               **MR. WATKINS:**    The first matter for sentencing is 6

5    -- excuse me, 8:18-480, United States versus Lecroy. Mr. Lecroy

6    is present with his counsel, Ms. Soderdahl.

7               **THE COURT:**    Okay. Good morning, Ms. Soderdahl.

8               **MS. SODERDAHL:**    Good morning, Your Honor.

9               **THE COURT:**    Let's go ahead and swear the defendant.

10              **THE CLERK:**    May it please the Court, Your Honor.

11         Sir, will you raise your right hand to be sworn?

12         (The defendant is first duly sworn.)

13              **THE DEFENDANT:**    Yes.

14              **THE CLERK:**    Thank you, sir.

15              **THE COURT:**    Okay. Ms. Soderdahl, have you gone over

16   the presentence report with your client?

17              **MS. SODERDAHL:**    Yes, I have, Your Honor.

18              **THE COURT:**    And I understand you have some

19   objections, which I'll hear in a few minutes.

20         Mr. Lecroy, have you read the presentence report?

21              **THE DEFENDANT:**    Yes, Your Honor.

22              **THE COURT:**    Okay. Do you understand it?

23              **THE DEFENDANT:**    Yes, Your Honor.

24              **THE COURT:**    All right, then. For the record, I will

25   go ahead and say that, under the statute, he is looking at: Not

1    more than 10 years; supervised release, not more than three

2    years; probation, he is eligible one to five years; the fine is

3    $250,000; the special assessment fee is $100.

4            Under the guidelines, his total offense level is 37;

5    his criminal history category is I; he's not eligible for

6    probation; and the guideline range is a flat 120 months

7    imprisonment; one to three years of supervised release; the

8    fine is not calculated; restitution is not applicable; and

9    there's a $100 special assessment fee.

10           But I'm happy to hear from you in regards to your

11   objections, Ms. Soderdahl.

12           **MS. SODERDAHL:**   Thank you, Your Honor. We have one

13   objection to the presentence report. It relates to Paragraph 13

14   and 26, where the presentence report applies the hate crime

15   motivation adjustment to this offense. This adjustment is under

16   the guideline section 3A1.1(a). And according to the

17   guidelines, it's appropriate if the Court determines beyond a

18   reasonable doubt that the defendant intentionally selected any

19   victim as the object of the offense of conviction because of

20   the -- and in this case, it's -- what's relevant is: race of

21   any person.

22           In this case involving Mr. Lecroy in a charge of

23   murder-for-hire, there is a very reasonable doubt because

24   Mr. Lecroy did not intentionally select the target of the

25   offense because of his race. In this case, Mr. Lecroy selected

1    as the target of the offense a person I will call "FJ," and it

2    was because of the things that FJ did to Brandon. In order to

3    fully explain the situation, I have to delve a little bit into

4    Mr. Lecroy's history and circumstances of his life.

5            When he was six years old, his parents separated. His

6    father took Brandon and his brothers into his custody and

7    prevented them from seeing their mother. From the age of 6 to

8    20 years old, 14 years, Brandon had no sight or sound from his

9    mother whatsoever. In fact, his father moved occasionally in

10   order to continue to hide them so that their mother couldn't

11   find them.

12           Mr. Lecroy did not have a happy childhood. In

13   addition to the fact that he wasn't able to see his mother, he

14   was mentally and emotionally abused by his father and his

15   brothers. He has always been slow. Brandon's always been slow.

16   And his father and his brothers teased and bullied him, called

17   him worthless and stupid; degraded him. As his mother said in a

18   psychiatric report, she told the doctors that they treated him

19   like the village idiot.

20           Mr. Lecroy was also physically abused. He was

21   brutally beaten by his father throughout his -- since --

22   starting at the age of six all the way, probably, until he was

23   20. He was beat with a belt, with an extension cord, with a

24   hammer, with hose pipes; whatever tool was available to his

25   father was what was used.

1          Mr. Lecroy's father was an alcoholic. At least from

2    what I hear from Mr. Lecroy, he was almost constantly under the

3    influence of alcohol. And it's possible that his father also

4    suffered from mental illness. Mr. Lecroy tells me that, at some

5    point during his upbringing, his father spent some time in

6    Patrick B. Harris Psychiatric Hospital.

7          As noted in the psychiatric report that was done by

8    the Bureau of Prisons in this case, a provisional diagnosis of

9    posttraumatic stress disorder was made on Mr. Lecroy because of

10   the trauma that he endured at the hands of his father

11   throughout his childhood. As a result of the abuse, Mr. Lecroy

12   basically stalled at six years old. He stopped learning in

13   school. He attended special education classes but, eventually,

14   they just had him doing custodial work in the school. He

15   currently reads at a second grade level. He told you that he

16   did read the presentence report, but I actually had to read it

17   to him. He spells at a first grade level and his sentence

18   comprehension is at a third grade level.

19         But in many ways, Brandon thinks and acts like a

20   six-year-old child. He has difficulty focusing. He's fixated on

21   fantasy. He likes to talk about tow trucks and how he works as

22   a tow truck operator. He tells me about his dreams of becoming

23   a fireman or an EMT worker. He's like a child, Your Honor.

24         The circumstances of this case are very unique to

25   this case. It's not a generalized hate crime. It is the case of

1   Brandon Lecroy. He lives in the middle of nowhere. I did file a

2   motion and sentencing memorandum, in which I attached some

3   aerial photographs of his property. It was his father's house

4   that he inherited when his father passed away. It's in the

5   middle of nowhere surrounded by forests and trees. It's very

6   isolated, and Mr. Lecroy is very isolated. He can't drive.

7   There's no public transportation available.

8           Mr. Lecroy doesn't have a lot of neighbors. His

9   closest neighbor is FJ. Now, Mr. Lecroy has made a choice to

10  isolate himself. And he lives in this relatively peaceful

11  solitude out in the middle of nowhere. He has a large yard. He

12  spends time out in his yard in nature. But his closest

13  neighbor, FJ, wouldn't leave him alone.

14          FJ would come over to his house at all hours of the

15  day and night, sometimes several times a day. And at least,

16  according to what Mr. Lecroy observed, this FJ appeared to be

17  under the influence of drugs or alcohol when he'd come over. He

18  was very irrational. Brandon told him to stop coming over, but

19  he wouldn't stop. When he would come over, he would ask for

20  things. He'd ask to use the phone. He'd ask for food. He'd ask

21  for cigarettes and Mr. Lecroy would tell him no and ask him to

22  leave.

23          But instead of leaving, FJ would become belligerent.

24  He'd argue with Brandon. He would throw things in his house.

25  He's threatened Brandon. He said he would burn down his

1   property. He said he would poison him. Brandon couldn't go to

2   the mailbox without being accosted by this neighbor, FJ. And

3   Brandon just wanted to be left alone.

4         Unfortunately, FJ's actions and behavior reminded

5   Brandon of his father, being under the influence, pestering

6   him, attacking him, being irrational. And it brought back these

7   memories. Mr. Lecroy called police to deal with the problem.

8   They came. They talked to him. They did nothing, except they

9   did issue a no-trespass notice to FJ, but they didn't enforce

10  it.

11        After the no-trespass notice was given to FJ, Brandon

12  called them several times to tell them that FJ had been on his

13  property, but the police told him they could do nothing about

14  it unless Brandon brought them better evidence than what he was

15  saying. They wanted video and photographs. Brandon hung up

16  no-trespassing signs. Everything was to no avail. FJ kept

17  coming back.

18        Now, that is why this is a unique situation about

19  this case. It's not about an overriding hatred or feeling

20  toward a certain race of people. It's about one individual, one

21  individual that was the target of Mr. Lecroy's offense.

22        The government and the PSR indicated that there are a

23  couple of reasons why the hate crime motivation enhancement

24  should be applied. The first one is the fact that Mr. Lecroy

25  called the KKK. That's true. Mr. Lecroy, when confronted by

1    this pestering, annoying behavior, went on the Internet and he

2    googled KKK and he found an 864 number to the local branch and

3    he called them. He's not associated with the KKK in any way.

4    He's never been or tried to be any member of a White

5    Supremacist Organization.

6            As a result of his arrest, his computers were seized

7    and searched for any evidence of white supremacy activity or

8    thoughts, but nothing was found. Brandon called the KKK

9    because, who else was he going to call? He's a simple guy. He

10   wanted something done, and that's who he called. He figured

11   that they might be the kind of people that can help him with

12   his problem. He had a neighbor that was bothering him, and the

13   police didn't help.

14           In that first phone call, which I believe the

15   government provided as an attachment to their response to my

16   motion, you could hear Brandon telling the guy, that was an FBI

17   agent but that he thought was a KKK person, that -- he didn't

18   say, "I want to kill a black man because he's a black man" or

19   "I want to kill this person because of his race." He said, "I

20   want to kill my neighbor because he keeps coming over and

21   trying to start a fight with me. He keeps trying to start a

22   fight with me."

23           The second reason that they give for applying this

24   enhancement is the language and the words that Mr. Lecroy used.

25   He used the N-word, he discussed "flaming cross," and "hanging"

1  FJ. We know -- everyone in this courtroom knows that these

2  things are associated with racism and hate, but Brandon doesn't

3  know the historical significance of these things. He stopped

4  learning at school at the age of six, but his father kept

5  teaching him. His father was probably a racist. I've been told

6  that his father would frequently would use the word -- the

7  N-word, and Brandon was parroting the things his father said.

8          I asked Brandon where he got these ideas of flaming

9  crosses and hanging people in trees. He told me that it was

10 stories that he was told when he was growing up by his father

11 and his uncle. To him, they were stories, images that stuck in

12 his mind, but that had no racial significance.

13         The government's response says that Brandon asked for

14 his neighbor to be lynched. Of course, he never used that word.

15 He doesn't know that word. He doesn't know the meaning of that

16 word. He used words that he used his father -- heard his father

17 and his uncle say. Like a child, he's repeating what others

18 around him are saying. A lot of children say bad words because

19 they don't know what they mean, but they learn very quickly

20 when they get a bar of soap in their mouth or they get

21 punished. But Brandon didn't have anybody in his life to do

22 that. He was never taught the significance or the meaning

23 behind the words that he was using.

24         So the bottom line is: We are objecting to this hate

25 crime enhancement because this was not an intentional desire of

Sentencing Hearing                                                    10

1   Brandon to select his victim based on his race. It had nothing

2   to do with the color of his neighbor's skin. It had everything

3   to do with FJ as an individual and these unique circumstances.

4        **THE COURT:**   Okay. Mr. U.S. Attorney?

5        **MR. WATKINS:**   May it please the Court, Your Honor.

6   Ms. Soderdahl has woven in what I would consider some more

7   mitigating factors about the level of his functioning, which I

8   would like to hold off addressing until my 3553(a)

9   presentation. Looking specifically at this objection, as she

10  announced the standard, you must find beyond a reasonable doubt

11  that he selected his victim based on his victim's race.

12       Your Honor, I think the fact that he reached out to

13  the KKK, that this was not a low-functioning individual that

14  had just heard stories. He has a black neighbor. And

15  undoubtably, the relations between the two weren't the best,

16  but he sought to have him eliminated. It's telling that, in

17  order to get a black person eliminated, who he turned to: the

18  KKK, a known White Supremacist Organization.

19       Your Honor, as outlined in my sentencing memorandum

20  -- and you know, please forgive any language I use. I'm simply

21  going to quote the defendant, but during his very first

22  conversation with the KKK, his recommended hit man, who,

23  fortunately, was an FBI undercover, at one minute into the

24  call, he informs him that he has, quote, this nigger neighbor,

25  end quote, who causes him problems. You know, he says he's

1  unhappy with law enforcement, and then says, quote, I'll call

2  the damn clan and they can throw a damn flaming cross in your

3  fucking yard, you little bastard. And you will say, "How do you

4  like that shit?" Then he talks about wanting the clan to drag

5  FJ into the yard by the flaming cross and beat him.

6          Your Honor, when pressed with exactly what he wants

7  done, he suggests, you know, hanging him right there by the

8  flaming cross. When contemplating FJ's death -- again, we're in

9  the first phone call with the hit man. There are multiple calls

10 -- Mr. Lecroy says, quote, Oh fucking well. That's just a dead

11 nigger to me, end quote, as if this is a vermin that you're

12 exterminating from your barn, instead of a human being who

13 lives next door to you.

14         Judge, he isn't the most highest functioning

15 individual, but he knew what to do to try to terrorize a black

16 person. He turns to the clan and he makes his intentions very

17 clear on what he wants to happen to FJ. Your Honor, I don't

18 think he's such a low-functioning individual that he did not

19 understand if you want to terrorize a black person, you go to

20 those with sheets and robes. He went straight to the clan. And

21 then, he conjures up this vision of a cross flaming in the yard

22 of a black person; the black person being beaten in front of

23 the cross; and then hung from a tree by a noose.

24         Your Honor, the government believes that you can

25 easily meet this standard beyond a reasonable doubt by just

1    listening to Mr. Lecroy's words. What he has in mind for his

2    neighbor is very race-specific. He doesn't try to call a biker

3    gang to get a random person beat up. He goes to the clan in

4    order to take care of his neighbor.

5              Again, when pondering the violent death of FJ, he

6    says, quote, He'll just be a dead nigger to me, end quote.

7    Again, treating him like he's subhuman, not worthy of the

8    dignity that a person made in God's image should have. Granted,

9    he might not have been the best neighbor. Don't know the full

10   story on that. I'm sure they had troubles there.

11             But Judge, when you add up that this gentleman was

12   sent to the BOP, he is found competent. He knows right from

13   wrong. It's not a question of his competency. We look to the

14   organization to which he's turned to, notorious White

15   Supremacist Organization, that has roots going back since

16   reconstruction in terrorizing a particular segment of the

17   population. And he envisioned some sort of horrific death, you

18   know, out of -- that is connected to racism and terrorizing

19   black people.  When you put all of that together, Judge, and

20   his comments about FJ, the government believes beyond a

21   reasonable doubt that he targeted him because of his race in

22   this case.

23             Again, there certainly were disputes between

24   neighbors. He, undoubtedly -- I've seen reports where he's

25   called the police before because of their disputes. But when it

1  all boils down to it, he sought to eliminate his neighbor based

2  on his race and took steps that show great forethought and

3  planning to carry out, essentially, a hate crime. Therefore,

4  based on the phone calls and what we've put in our sentencing

5  memorandum, which you have, we believe that the probation

6  office correctly gave him this three-level enhancement and that

7  the facts fully support the enhancement in the case.

8        **THE COURT:**   Well, I think the evidence of -- there

9  is evidence of racial animus beyond a reasonable doubt in this

10 case and that animus was directly connected to the offense that

11 the defendant pled guilty to. I've carefully listened to the

12 arguments. I've reviewed and considered the objection raised by

13 the defense. And, now, I'm going to overrule that objection.

14       Mr. Lecroy has challenged the three-level enhancement

15 under guideline 3A1.1(a) for hate crime motivation. And

16 Ms. Soderdahl, on his behalf, asserts that his motivation for

17 hiring a hitman to kill his neighbor was not the neighbor's

18 race, specifically African-American, but the neighbor's

19 bothersome behavior, repeated trespassing, and even threats

20 against Mr. Lecroy when he failed to give him cigarettes, food,

21 or use the phone.

22       The defense references Mr. Lecroy's responses to law

23 enforcement questioning about his motivation, in which he,

24 Mr. Lecroy, specifically denied those actions were based on

25 race and claimed that he was motivated by the fact that his

1   neighbor was an ass. The Court is unconvinced.

2           Mr. Lecroy's self-serving denial of his racist

3   motivations during interrogation by law enforcement is belied

4   by the fact that he sought out the Ku Klux Klan in his efforts

5   to hire a hit man and by the fact that he specifically

6   requested that the FBI undercover agent put a flaming cross in

7   his neighbor's front yard and hang the neighbor from a tree.

8   Those requested actions are unquestionably and beyond any

9   reasonable doubt associated with historically symbolic hate

10  crimes. And Mr. Lecroy's claims about his neighbor being an ass

11  are insufficient to overcome the clear import of such terrible

12  requests. So the objection is overruled.

13          But nevertheless, in an abundance of caution, the

14  Court notes that it would've imposed the same sentence on

15  Mr. Lecroy, even if it had found that the hate crime motivation

16  guideline was improperly applied, and sustain the objection.

17  The removal of a three-level objection would move his guideline

18  range to 151 to 188 months, still well above 120-month

19  statutory cap for his offense and conviction. In any event, the

20  Court finds the guideline range of 120 months.

21          I'm going to hear from you further, Ms. Soderdahl,

22  and hear from your client and anybody else, but the guideline

23  range of 120 months is certainly, on its face, sufficient but

24  not greater than necessary to achieve the purposes of

25  punishment. And I've already put the range on the record, but

Sentencing Hearing                                                    15

1   I'm happy to hear from you further, Ms. Soderdahl.

2       **MS. SODERDAHL:**    Thank you, Your Honor. I did also

3   file a motion for a downward departure or variance. It's my

4   position that the guidelines don't adequately take into account

5   the facts and circumstances of the case and the history and

6   characteristics of Mr. Lecroy. It's not a typical or usual

7   case. It's a very outside-of-the-box kind of case. I've already

8   talked a little bit about Mr. Lecroy's history and

9   characteristics. I would add only a couple of more details

10  about that. Many of these are gleaned from a psychiatric report

11  that was done in April of last year.

12      Mr. Lecroy has never held a job. He cannot hold a

13  job. He has problems with things like his daily hygiene and he

14  has to be reminded of simple tasks of things like brushing his

15  teeth and washing his clothes. He's received disability checks

16  since he was about six years old. He has a learning disability,

17  and he cannot manage a bank account. His mother is his power of

18  attorney. So those checks go to this mother and she disperses

19  the amounts.

20      Mr. Lecroy also has physical limitations. When he was

21  17 years old, he tried to hot-wire a lawn mower. The gasoline

22  that was in and around the mower caught fire and engulfed him

23  in flames that resulted in him being placed into a

24  medically-induced coma for several months. He went through

25  several surgeries, physical therapy. He still has burn scars

1    over most of his body, but he has visible scars on his face,

2    his neck and his torso. And he still gets treatment and still

3    suffers from some physical limitations, including he has a

4    slight limp that can sometimes be a little bit more than

5    others. He's also is unable to raise his arms above his head.

6           Mr. Lecroy also suffers from anxiety, perhaps as a

7    result of the provisional diagnosis, at this point, of

8    post-traumatic stress disorder, post-traumatic stress disorder

9    has, as a result of that disorder, increased psychological

10   arousal. And it's true that when Mr. Lecroy gets nervous or

11   scared, he gets irritable and agitated. And I don't know if

12   Your Honor can tell, but he's -- he's shaking like a leaf right

13   now in court. He's very agitated.

14          Mr. Lecroy does not think or act like an adult. He

15   lives in a fantasy world. I've spent a lot of time with

16   Mr. Lecroy because of his learning disabilities. Every piece of

17   discovery, I've had to read to him. Mr. Lecroy is very

18   talkative and he is hard to keep on point. He likes to talk

19   about his own fantasies. He likes to talk about cars and

20   trucks. He talks about how he's worked as a tow truck driver in

21   the past. He talks about doing mechanical work on heavy

22   machinery. Like I said before, he talks about his dreams of

23   becoming a fireman and a tow truck driver.

24          As noted in the report, also he was observed to be,

25   even during his evaluation, braggadocios and loud. And that he

Sentencing Hearing                                                    17

1    made provocative statements either -- even to other people that
2    were there in the Bureau of Prisons with him. It's something
3    that he doesn't have an ability to control. He's like a
4    six-year-old child.
5            There are several conversations that were reported
6    and provided in discovery between Mr. Lecroy and the undercover
7    agents. Even in those conversations, this bears out: He --
8    Mr. Lecroy goes very much off-topic during those conversations,
9    not only talking about FJ and this plan, but also talking about
10   tractors and tow trucks and buying property and becoming
11   certified as an EMT and a fireman. He's got a problem thinking
12   like an adult. He can't do it. He's a six-year-old child. And
13   it happened in this case.
14           I imagine that, at some point, even the agents on the
15   phone might have thought that they were being punked just by
16   the things he was saying and the conversations that he was
17   engaging them in. It wasn't really all about this; it was also
18   about those other fantasies that he has.
19           Despite his limitations, Mr. Lecroy has stayed out of
20   trouble. He's never been arrested before. His only contact with
21   law enforcement was when he was calling them to report the
22   neighbor that was pestering and a nuisance. He has no prior
23   convictions. He's found a way to live his life in relative
24   peace. He keeps mostly to himself. He keeps himself occupied.
25   He's fascinated by this heavy machinery. He has been

Sentencing Hearing                                                          18

1    volunteering at a wrecker service that's owned by a disabled

2    veteran. He gets to ride along in the trucks. He gets to help

3    out at the shop. He mans the gate at the impound yard. He does

4    what he can to be around the things that he loves and then he

5    keeps to himself.

6            The purpose of the sentencing would be, I think,

7    reached by a below guideline sentence in this case. Any term of

8    imprisonment for Mr. Lecroy is going to teach him a very

9    serious lesson. I know that being here today -- just by looking

10   at his physical reaction, I know that he's very uncomfortable

11   and the conversations that we've had also, I think, really

12   taught him a lot about the things that he didn't know about the

13   world.

14           Mr. Lecroy has already been in custody one year. He

15   is deterred from criminal conduct. He's, I think, embarrassed

16   about what he did. Listening to the phone calls clearly

17   embarrassed him. We sat through and listened to all of them

18   over in the jail. He pled guilty because he does accept

19   responsibility for what he did, and he'd like to move on. He

20   knows that what he did was wrong.

21           And he is telling me that he would like to seek help

22   in controlling his own behavior in the future. He knows that he

23   has the power to regulate his responses to external stimuli, as

24   it were. And people, like his neighbor, that are going to be

25   irritating, that's going to happen in life. And he would like

1    to get some help, some mental health treatment, in order to

2    help him learn how to, himself, control his reactions and

3    responses to these things.

4              **THE COURT:**    Okay. Happy to hear from the government.

5              **MR. WATKINS:**    May it please the Court, Your Honor.

6    The government would just ask you to impose a guideline

7    sentence, which ends up being the statutory maximum in this

8    case. Your Honor, first is the nature and circumstances of the

9    offense. Much of that was discussed in my earlier presentation

10   about the objection. You know, this is a serious matter to the

11   United States when an individual reach -- reaches out to a

12   White Supremacist Extremist Organization and attempt to have

13   someone murdered. That is a serious crime. And Mr. Lecroy,

14   fortunately for us, was directed to an FBI undercover agent who

15   was in the right place; and therefore, no harm could befall FJ

16   or anyone else. So that is, you know, grievous, a serious

17   matter, Judge.

18        As to his individual characteristics, I think much of

19   what Ms. Soderdahl has said about he's been in special

20   education classes, is not a high-functioning individual, is

21   very true; that he does need help from his family to manage his

22   home and property and things like that. It also enures to his

23   benefit. He's never been in trouble before, Judge. This is the

24   first time he's had to come to court and answer for a charge.

25   Your Honor, he's lived, apparently, a law-abiding life, until

Sentencing Hearing

1    he jumped, as we shall say, in the deep end of the pool to seek

2    to have someone murdered. A big uptick in his behavior.

3        Your Honor, I do understand he has -- he is a

4    low-functioning individual, and I don't argue with that.

5    However, if you've looked at his forensic report from the BOP,

6    as well as my sentencing memo and his interview with law

7    enforcement when he was arrested, you know, it's clear that he

8    was able to consistently communicate his interests and requests

9    in a clear and coherent manner to the hit man in trying to have

10   FJ murdered. He collected evidence, such as photographs,

11   biographical data, that he sent to the hitman about FJ's

12   property in an effort to help him identify it and fulfill the

13   mission that Mr. Lecroy was hiring him to do.

14       When arrested, Mr. Lecroy was able to spin a pretty

15   good story to law enforcement that he claimed that he and the

16   hit man, who was known as Mark to him, that Mark had simply

17   shown up and he got in the car with him and they drove off to

18   talk with one another when, actually, the purpose was he was to

19   pay Mark and they were to case FJ's house and prepare for the

20   murder. You know, he tells the police that he simply had Mark

21   there to try to persuade FJ to leave him alone.

22       And then, when he's eventually confronted by the FBI,

23   that, "Brandon, we've been recording you for weeks now, we know

24   what you've been saying with Mark, you want to get right with

25   us?," realizing -- again, his mind working in a logical fashion

Sentencing Hearing                                                    21

1    -- that he was caught, he starts to explain what he did and

2    then realizes -- admits to law enforcement, "Yes, had this not

3    been an FBI undercover employee, FJ could have probably been

4    killed today." So he is able to reason and follow and exercise

5    deception, as well as form coherent plans.

6              Judge, again, you look at the totality of the

7    factors. We believe a sentence of the guidelines will deter him

8    from future criminal conduct, it will protect the public, the

9    members of his community that certainly have to have some

10   concern about having someone trying to hire a hit man in their

11   mist, Judge, and it will promote a general respect for the law

12   of others who might be considering some unspeakable act such as

13   this. So for those reasons, Your Honor, we would ask that you

14   impose a guideline sentence at the statutory maximum on Brandon

15   Lecroy.

16             **THE COURT:**  I'm going to deny the defendant's motion

17   for downward departure, or downward variance, and I'm going to

18   adopt the findings of the presentence report. The defendant was

19   found competent in his mental evaluation. And then, after

20   competency hearing conducted by the United States Magistrate

21   Judge Kevin McDonald, he was deemed competent. So I think the

22   evidence is sufficient to find that he had the wherewithal to

23   orchestrate what he intended as a murder based on race of his

24   neighbor. And that is what he sought to do.

25             I'll be happy to hear from you further,

Sentencing Hearing                                                    22

1   Ms. Soderdahl. Is there anything else or would your client like

2   to speak on his behalf?

3          **MS. SODERDAHL:**   Your Honor, regarding Mr. Lecroy

4   wanting to speak, he does have a few things to say, but he's

5   extremely nervous and he's asked me to pass along the word that

6   he does apologize to the victim in this case for any stress or

7   anxiety that he's caused him regarding these offenses. Of

8   course, I don't believe that the victim was aware that it was

9   happening when it was happening but is now aware of it and, I

10  know, has expressed some concerns to the prosecutor about his

11  safety, and Mr. Lecroy does apologize for that.

12         Mr. Lecroy also asked me to apologize for the police

13  officers, the FBI agents, and the prosecutor for having to deal

14  with him in this way, for having to investigate something that

15  he was doing, and for having to write all of these reports and

16  make all of these recordings and bring this case to court. And

17  he apologizes to the Court for having to hear the facts of this

18  case which are, I know, not pleasant to the ear.

19         Also, while we've been before Your Honor, numerous

20  family members have arrived in court on behalf of Mr. Lecroy. I

21  think he's got, at least, a row of people back there that are

22  just here to show their love and support and to tell you that,

23  I'm sure, that they will be there to love and support him,

24  whatever term of imprisonment is imposed and when he is

25  released.

1          **THE COURT:**    Okay. I see somebody is standing back

2    there.

3          **SPEAKER IN THE AUDIENCE:**    This is his stepfather.

4          **THE COURT:**    Okay. Does he want to be heard?

5          **MS. SODERDAHL:**    No, Your Honor.

6          **THE COURT:**    I take judicial notice of the fact that

7    they're all there and they are there in support, as you said.

8    So having calculated and considered the advisory sentencing

9    guidelines and having also considered the relevant statutory

10   factors under 3553(a) in Title 18, and I've woven my position

11   in my ruling in regards to the 3553(a) factors into my other

12   remarks, and I also, specifically, adopted the government's

13   argument as to those factors. It's the judgment of the Court

14   that the defendant, Brandon Cory Lecroy, is hereby committed to

15   the custody of the Bureau of Prisons to be imprisoned for a

16   term of 120 months. It appears he doesn't have the ability to

17   pay a fine, so the fine is waived. He shall pay the mandatory

18   $100 special assessment fee.

19          Upon release from prison, he'll be on supervised

20   release for a term of three years. And within 72 hours of

21   release, he shall report in person to the probation office in

22   the district to which he is released. While on supervised

23   release, he shall comply with the mandatory and standard

24   conditions under 18 U.S.C. 3583(d) and the following special

25   conditions for the reasons set forth in the presentence report,

Sentencing Hearing                                              24

1  which I've already adopted as the findings of fact the purpose

2  of this sentence, and that is: He shall participate in mental

3  health treatment as directed by probation until such time as

4  he's recommended for release. He shall contribute to the cost

5  of that, not to exceed an amount determined reasonable by the

6  court-approved U.S. Probation Office's Sliding Scale for

7  Services, and cooperate in securing any applicable third-party

8  payment, such as insurance or Medicaid; and submit to random

9  drug testing.

10          I think this is a significant case. And hopefully, it

11  will deter any further actions by anybody else in the

12  community. It's one thing to think these thoughts, but it's a

13  crime to undertake harm to another based on those thoughts. And

14  I've calculated, I believe, the advisory guideline range

15  properly and correctly addressed the points that have been

16  raised. But if it's somehow determined that I haven't, I will

17  say for the record now: I would have imposed this very same

18  sentence in light of the totality of the circumstances present

19  in this case and in light of the 3553(a) factors.

20          You have 14 days from the entry of judgment to file a

21  notice of appeal. If you want a lawyer and you can't afford

22  one, I'll appoint one for you. But I'd ask Ms. Soderdahl to see

23  you through in regards to filing any notice of appeal. Thank

24  you.

25          **MS. SODERDAHL:**   Thank you, Your Honor. Would you

Sentencing Hearing                                                    25

1  mind recommending Butner so he can get mental health treatment?

2              THE COURT:   Uh-huh. I'll recommend Butner.

3              MS. SODERDAHL:   Thank you, Your Honor.

4              MR. WATKINS:   And, Judge, I'd move to dismiss the

5  remaining counts of the indictment against Mr. Lecroy.

6              THE COURT:   Granted.

7              MR. WATKINS:   Thank you, Judge.

8        (Proceeding concludes at 10:36 a.m.)

9

10                        *********

11                   C E R T I F I C A T E

12     I certify that the foregoing is a correct transcript from

13  the record of proceedings in the above-entitled matter.

14

15  _____        June 10, 2019

16  Teresa B. Johnson, CVR-M-CM, RVR, RVR-M            Date

17

18

19

20

21

22

23

24

25